NO. 07-97-0487-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

JULY 5, 1999

_____

DANA MARIE CONTRERAS, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NO. 37,880-D; HONORABLE DON EMERSON, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

ON MOTION FOR REHEARING

After a consideration of appellant's motion for rehearing, our April 6, 1999 opinion is withdrawn and the following opinion is substituted therefor.

In challenging her murder conviction and the resulting sentence of 40 years confinement in the Institutional Division of the Department of Criminal Justice, appellant Dana Marie Contreras presents seven issues which, she argues, require reversal of that conviction. For reasons we later discuss, we reverse the judgment of the trial court.

Because the first issue concerns a question which would again occur upon retrial and the second issue is dispositive of this appeal, it is not necessary to discuss the last five of appellant's issues. At the time of the alleged offense, appellant was 15 years old and was certified to stand trial as an adult by Potter County Court at Law No. 1. In her first two issues, appellant asks 1) must the State affirmatively allege and prove that the County Court at Law No. 1 of Potter County had jurisdiction to enter an order waiving its juvenile jurisdiction and transferring the case to the District Courts of Potter County for appellant's trial as an adult; and 2) did the trial court reversibly err by admitting appellant's written confession into evidence over objection?

The nature of appellant's questions necessitates that we discuss the facts in some detail. On January 11, 1996, the victim, Neal Winegar, was fatally stabbed by appellant. Winegar was involved with, and lived with, Kenna Andrews, appellant's mother. Kenna testified that she and Winegar met in August 1993, and began living together in October of that same year. However, friction developed between appellant and Winegar, and in December 1994, Kenna asked Winegar to move out of her house. In May 1995, appellant went to live with her stepfather, and the next month Winegar moved back in with Kenna and appellant's sister, Sueletta Andrews. In November 1995,

appellant returned from her stepfather's home to live with Kenna, Winegar, and Sueletta. From that time until Winegar's death, the four lived together.

In her testimony, Kenna averred that although appellant and Winegar were always "at odds," Winegar was never violent toward appellant and he left all the discipline of the girls to her. In recounting the events occurring on January 10 and the early morning hours of January 11, 1996, Kenna said that Winegar had taken appellant to school earlier on January 10. On the evening of January 10, Winegar cooked dinner for the family, but appellant did not join them in that meal. Sueletta went to bed between 8:30 and 9:00 p.m. Later, between 11:30 p.m. and 12:00 a.m., Kenna and Winegar also retired.

On January 11, about 1:00 a.m., Kenna was awakened by Winegar, who asked her to speak to appellant.[1] Pursuant to that request, Kenna went to appellant's room and told her to go to bed. Kenna then went to sleep and the next thing she remembered was Winegar moaning, and then he rolled into her on the bed. About the same time, she heard the front door shut and, thinking that appellant might have run away from home as she had done before, Kenna went to check appellant's bedroom. As she had suspected, appellant was not there. Preparatory to calling the police to report appellant's absence, Kenna went to the bathroom, at which time she noticed blood on her nightgown. She turned on her bedroom light to see where the blood came from and saw that Winegar was lying in a pool of blood. Kenna then went to the telephone to call 911 to report Winegar's condition, and

---

[1]Appellant testified that she had been ironing in her room and Winegar had come in and told her to go to bed because she was making too much noise.

as she did so, she noticed that the receiver was off the hook and the 911 operator was already on the line. Winegar was taken to the hospital where he died about an hour to an hour and a half later.

Apparently, after receiving a call from the 911 operator at about 3:00 a.m. on January 11, 1996, the Amarillo police dispatcher sent Lieutenant Kenneth Farren to Kenna's residence. As Farren arrived at the residence, appellant approached, apparently coming from a deserted schoolyard to the west of the house, told the officer she was the one who called, and said "[h]e's been stabbed." When asked who the victim was, she replied that it was her stepfather. When Farren asked appellant "[y]our father stabbed your mother or your mother stabbed your father, " her reply was "I stabbed him." Because she was a juvenile, Farren said he did not question her further, but put her in a patrol car while the investigation ensued. Later, as police prepared to take her to the police station, Farren checked her for weapons as well as for physical evidence such as any transfer of blood from the knife or from the victim that might connect her with the crime scene. When asked to display her hands, appellant responded, "[o]h no, I was wearing gloves."

The officers transported appellant to the police station about 3:46 a.m. and, upon their arrival at approximately 3:54 or 3:55 a.m., they took her to the juvenile division. Sometime thereafter, Potter County Justice of the Peace Terry Miller arrived, gave appellant her juvenile warnings and, at 5:15 a.m., both Judge Miller and appellant signed a form acknowledging the warnings had been given and received. Detective Terrance Tracy then took a written statement from appellant which was completed at 6:05 a.m. About 9:25 a.m., Amarillo Municipal Judge Donna Clayton came to the police station. Because a detailed discussion with her convinced Judge Clayton that appellant

4

understood the nature and contents of the instrument, Judge Clayton signed the statement. There was testimony that although appellant was alone in the room for some periods of time, detectives and other personnel were in close proximity.

Initially, as a juvenile, appellant was charged with engaging in delinquent conduct. Subsequently, however, the Potter County Court at Law No. 1 waived its juvenile jurisdiction over appellant, the case was transferred to the 320th District Court of Potter County, and appellant was indicted for murder. It is that action that appellant challenges in her first issue. In doing so, appellant claims the State neither pled nor presented proof that the Potter County Court at Law "had been 'designated' a juvenile court." Specifically, she contends it is a fact issue as to whether that court had been designated as a juvenile court, and because of this, "the designation by the juvenile board of Potter County must have been alleged and affirmatively proven" in order to show the juvenile jurisdiction of the County Court at Law. She bases that argument on the premise that "a juvenile court is not one of general jurisdiction, [and] its power to act is derived exclusively from the statutory authority taken from the **Texas Family Code**." In support of her proposition that factual proof was required, she cites and relies upon *In the Matter of A.S.*, 875 S.W.2d 402, 403 (Tex.App.--Corpus Christi 1994, no writ).

Because the question before the *A.S.* court was different from that now before us, we do not agree with appellant and, therefore, we find *A.S.* is not dispositive of her first issue. Appellant's reliance, however, warrants a discussion of the case. In *A.S.,* the juvenile was charged with engaging in delinquent conduct and the court held that in order to show the court's juvenile jurisdiction, the

5

prosecution must both plead and prove the age of the juvenile. *Id.* En route to its decision, the appellate court explained that the power of a court to adjudicate juvenile delinquent conduct is derived exclusively from the statutory grants of power delineated in the Family Code. *Id.* Thus, it was necessary to prove the age of the juvenile accused of delinquent conduct in order to show the minor was subject to, and could be acted upon under, the Juvenile Justice Code. *Id.*

At the outset, we note that section 51.02(6) of the Family Code defines a "juvenile court" as a court that has been designated under section 51.04 of the Family Code to exercise jurisdiction over proceedings under the Juvenile Justice Code. Tex. Fam. Code Ann. § 51.02(6) (Vernon 1996). In relevant part, section 51.04(b) of the Family Code provides that the county's juvenile board shall designate one or more courts, which includes county courts at law, as juvenile courts. Tex. Fam. Code Ann. § 51.04(b) (Vernon 1996). Appellant claimed that *In the Matter of R.A.B.*, 525 S.W.2d 892 (Tex.Civ.App.--Corpus Christi 1975, no writ), because the record did not specifically reflect that the trial court had been designated as a juvenile court, it was without jurisdiction. The appellate court disagreed and, in doing so, pointed out that relevant statutory authority authorized certain courts, such as the trial court in that matter, to act as juvenile courts. *Id.* at 895. That being so, it reasoned, the burden was upon R.A.B. to show the trial court had not been properly designated, and he had failed to do so. En route to that decision, the court noted that the juvenile orders showed they were made in a cause pending in "THE JUVENILE COURT OF HIDALGO COUNTY" and they were signed by the judge "Sitting as a Juvenile Court in said County." *Id.* at 895-96. Likewise, the relevant orders in this case show they were "IN THE POTTER COUNTY COURT AT LAW #1 OF POTTER COUNTY, SITTING AS A JUVENILE COURT." Suffice it to say, we agree with the

6

reasoning of the Corpus Christi court. In this case, it was the burden of the juvenile to show the trial court had no jurisdiction to enter its transfer order. Under this record, she did not sustain her burden. Appellant's first issue is overruled.

In her second issue, appellant challenges the admission of her written statement into evidence. In doing so, she claims its admission violated sections 51.09, 52.02, and 52.025 of the Family Code, as well as violating Article 1, section 10 of the Texas Constitution and the Fifth Amendment to the Federal Constitution. Specifically, she argues the officers violated section 52.02 of the Family Code because they failed to take her immediately to a juvenile detention facility or a juvenile processing office. Additionally, she asserts that although Judge Clayton and Judge Miller are magistrates, they are not juvenile judges acting under the authority of the Juvenile Justice Code. Moreover, she claims, there is nothing in the record that shows they had been appointed by the Potter County Juvenile Board to receive children taken into custody or that the board had authorized them to give juvenile warnings.

In considering this second issue, our first task must be to decide if the length of time between appellant's detention and her arrival at the juvenile processing office violated section 52.02(a) of the Family Code. At the time with which we are concerned, the statute read:

**§ 52.02.  Release or Delivery to Court**

(a) A person taking a child into custody, without unnecessary delay and without first taking the child to any place other than a juvenile processing office designated under Section 52.025 of this code, shall do one of the following:

(1) release the child to a parent, guardian, custodian of the child, or other responsible adult upon that person's promise to bring the child before the juvenile court as requested by the court;

(2) bring the child before the office or official designated by the juvenile court if there is probable cause to believe that the child engaged in delinquent conduct or conduct indicating a need for supervision;

(3) bring the child to a detention facility designated by the juvenile court;

(4) bring the child to a medical facility if the child is believed to suffer from a serious physical condition or illness that requires prompt treatment; or

(5) dispose of the case under section 52.03 of this Code.[2]

Tex. Fam. Code Ann. § 52.02(a) (Vernon 1996).

Without citation of relevant authority other than the statutory language "unnecessary delay," appellant argues that the 50 minutes she sat in the patrol car at the scene before she was taken to a juvenile processing office violated that statutory requirement. The State responds that the delay was unavoidable because the officers were engaged in attending to the victim and obtaining preliminary information from witnesses. Thus, it reasons, because of these circumstances, the delay was not "unnecessary" within the purview of the statute. *See Littlefield v. State*, 720 S.W.2d 254 (Tex.App.-- Beaumont 1986, pet. ref'd).

It is the rule, of course, that when a police officer deems it necessary to take a child into custody, the procedures specified in the Family Code must be followed. *In the Matter of R.R.*, 931 S.W.2d 11, 14 (Tex.App.--Corpus Christi 1996, no writ). Because of its subjective nature,

---

[2]The method of disposal provided by section 52.03 is not material to our discussion of this case.

8

determining whether an "unnecessary delay" occurred must be on a case-by-case basis.  Thus, the decisions of other courts are helpful to us in conducting our analysis.

In *Comer v. State*, 776 S.W.2d 191 (Tex.Crim.App. 1989), the juvenile was arrested at his home at 6:24 p.m.  After a brief stop at a departmental office to pick up necessary waiver and statement forms, officers took him to the home of a justice of the peace, arriving there shortly after 7:00 p.m.  Pursuant to Family Code requirements, the juvenile was warned by the justice of the peace and then returned by the officers to the sheriff's department by 7:30 p.m.  Once at the sheriff's department, the juvenile gave a full written confession.  At 9:16 p.m., the juvenile was returned to the justice of the peace's home where he, with the officers in the next room, signed the confession.  The high court held that the approximate three-hour period of time it took to secure the confession violated section 52.02(a); thus, the confession was not admissible.  *Id.* at 196.

In *In the Matter of D.M.G.H.* 553 S.W.2d 827, 828 (Tex.Civ.App.-- El Paso 1977, no writ), the court also held a juvenile confession inadmissible.  In that case, a pregnant 16-year-old juvenile was arrested around 12:30 p.m., held in custody at a police substation until 7:25 p.m., then taken before a magistrate, and was not delivered to a juvenile detention facility until 10:20 p.m.  During this time period, no meals were given to the juvenile.  The State's rationale for the delay was that "fifteen pages of No. 1 police reports were being filled out," and it was also time consuming to take the juvenile to the detention facility.  The court held this rationale insufficient to justify the delay. *Id.* at 828.

In this case, the juvenile was taken into custody about 3:00 a.m. and was placed in the police car at that time. However, she was not taken to the juvenile processing office until some 45 or 50 minutes later. The written statement was not completed until 9:30 a.m. That the officers were investigating the stabbing is an inadequate justification for the delay in transporting her to a duly designated juvenile office. Under the strict requirements of section 52.02 of the Juvenile Code, we cannot hold that she was taken to the juvenile facility without the "unnecessary delay" prohibited by the Code. Accordingly, we must hold appellant's written confession was inadmissible.

Having determined the written confession was inadmissible, we must next determine if its admission requires reversal. Appellant contends that the admission of the confession was "constitutional error" within the purview of Rule of Appellate Procedure 44.2(a), which requires that in such instances reversal is required unless the reviewing court "determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Appellant cites no legal authority for that proposition and we have found none. The record before us demonstrates that prior to the making of the written confession, appellant was given all warnings constitutionally required. Nothing in the record indicates nor does appellant claim that the confession was induced by improper coercion or other improper inducements. In sum, if appellant had been an adult, under this record, the confession would have been admissible. The only reason it was not admissible was because the statutory 52.02 "unnecessary delay" requirement was not met. Thus, we conclude, because the error was statutory rather than a lack of compliance with constitutional prerequisites, the effect of the error must be analyzed under Rule of Appellate Procedure 44.2(b), which provides:

(b) *Other* Errors. Any other error,[3] defect, irregularity, or variance that does not affect substantial rights must be disregarded.

Tex. R. App. P. 44.2(b) (Vernon 1999).

Therefore, we must next determine if the admission of the confession affected a substantial right of appellant. Our Court of Criminal Appeals has explicated that a substantial right is affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997) (citing *Kotteakos v. U.S.,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Determining whether an error had a substantial and injurious effect on a verdict is not an easy task for a reviewing court and, of necessity, must be made on a case-by-case basis.

Our Rule 44.2(b) was taken from Federal Rule of Criminal Procedure 52(a) without substantive change. That being true, cases which have interpreted the federal rule are helpful to us. The seminal case concerning non-constitutional error is the one cited and relied upon by the *King* court, namely *Kotteakos v. U. S., supra.* In that case, the Supreme Court explained the analysis to be applied by the reviewing court is that if it is sure after reviewing the record that the error did not influence the jury, or "had but a very slight effect," the verdict must stand. *Kotteakos*, 328 U.S. at 764-65.

Additionally, in making our analysis, we must keep in mind that in doing so, we should not focus upon the propriety of the outcome but upon the integrity of the process leading to conviction.

---

[3]Apart from constitutional error.

11

*See Harris v. State*, 790 S.W.2d 568, 587 (Tex.Crim.App. 1989). In that connection, we note that appellant's oral confession, which we believe was admissible, did not give any of the details or reasons why she did so, but was merely a statement that she had stabbed Winegar. However, her written confession contained a detailed recitation of the events leading up to Winegar's death. That being so, we must consider the collateral implications of those details.

Because of its importance to our decision, we set out appellant's entire written confession. It is as follows:

> My name is Dana Marie Contreras. I am 15 years old. My date of birth is 1/23/80. I live at 904 N. Florida, Amarillo. My phone number is 376-9935. I am a student at Tascosa High School. I am in the 10th grade. Yesterday, January 10, 1996, I got home from school and fixed myself something to eat. I live at home with my mom, Kena [sic] Andrews, my sister, Sueleta [sic] Andrews, and my mom's boyfriend, Neal Winegar. After getting something to eat I went to my room. I did some of my homework. I fell asleep for a couple of hours. After waking up, I went out to the living room to be with the family. I was watching TV. Neal was on the phone. My mother was sitting there, talking with Neal as he talked on the phone. I do not know where my little sister was at. I really did not talk to them. I just sat there. I fixed myself something to eat. After I finished eating, I went to my room. I just stayed in my room listening to my radio. A little while later, I decided to go [sic] the laundry. I needed clothes for school. I put the clothes in the washer and went back to my room. I changed out purses for the one I was going to carry. When the washer was done, I put the clothes in the dryer. I cleaned my shoes while the clothes were drying. My mom and Neal were watching TV while I was doing all of this. I was trying to figure out what clothes to wear. My mom was now in the bedroom and Neal was in the living room. I got out the ironing board and was ironing my clothes to wear to school. Neal went to the bathroom. When he went by my room, Neal told me that I needed to go to bed. This made me mad when he did this to me. [I] went ahead and finished my pants. Neal went into the bedroom and told my mother. My mother went to the bathroom and then stopped by to see me. She stood in the doorway getting on to me, [for] getting smart with Neal. She left and went back to the bedroom. I could head [sic] her and Neal talking. I could not hear all they were saying. I had finished the ironing and was in bed. I was laying there thinking. I could still hear my mom and Neal talking. I could not hear all they were saying.

12

They were up for a long time. I was thinking about Neal and the things he does to make me mad. I was wondering if they had a letter a friend had written to me. They had been reading my letters from him. I got up and went to the kitchen. I got a drink of water. There was a knife sitting there on the cabinet. I got a drink of water. I took the water and the knife back to my room. The knife was a carving knife. I took the knife to the room and sat it on a chair. I got back into bed. My mom and Neal were still awake in the bedroom. I was just laying in bed thinking. I was waiting for them to go to bed so I could go and do this. My mother got up, went to the bathroom, turned off the radio in my little sister's room, and then came into my room. She turned off the light in my room. She doesn't normally come into my room. I was awake, but rolled over so she could not see that I was awake. She went back to the bedroom. It is like 2 in the morning now. I waited until things got quiet. I got up and put the mask on. I went to my little sister's room and tucked her in. She kind of woke up. I covered her up. I left her room and was shutting her door. She told me to leave it open. I went back to my room and turned on my light. I found some gloves under the chair in my room. I put the gloves on and grabbed the knife. I went into the living room and petted the cat. I was listening to see if mom and Neal were still awake. I could not hear much. Finally I could hear that my mother was asleep. When I heard that my mother was asleep, I went into the bedroom. I had pulled the mask down. I was wearing the mask and gloves so I would not get any blood on me. I went over to the right side of the bed. This is where Neal was sleeping. I looked at the clock and it was 2:51. When I walked in the room, Neal was laying on his stomach. He rolled over. I thought that he was going to wake up. I stopped to see if he was going to wake up. I heard him start snoring. I went up to the bed. I was thinking that I was not going to put up with it any more. I stabbed him in the chest area with the carving knife. I left the knife in him. I went to leave the room. I heard Neal gasp and left the room. I tried to close the door but there were some clothes in the way. I went to the living room and picked up the phone. I dialed 911 and set the phone down on the chair. I did not talk on the phone. I went to my room and took the gloves and mask off. I just dropped them as I walked. I could hear my mother talking. I went and shut my little sister's door to her room. I went outside and walked over to the school. I sat down on the steps and just watched the house. Finally the light came on in the house. The porch light came on and someone opened the door. I saw the police cars pull up. I walked over to them. They asked me if this is where the call had come from. I told them it was. They asked me who had called and I told them that I had. They asked me about guns in the house. I told them some hunting rifles were in the house. They walked off to the house. Two more officers came up to me. They asked me who had stabbed him. I said, "I did." They asked me to have a seat in the police car. They left me there and went into the house. I am giving this statement willingly and voluntarily. No promises or threats have been made to me. I have read the above and it is true and correct to the best of my knowledge.

At trial, appellant testified that she stabbed Winegar "[b]ecause I didn't want him to be with my little sister and I didn't want him to come into my room anymore. I wanted him to stop." She requested, and was denied, a charge on necessity. Relevant to the trial court's denial of that defense, among other incriminating statements in her written confession, appellant said she waited until Winegar was asleep, so that she "could go and do this." She also stated that she had gotten a knife out of the kitchen earlier and set it down in her room which, at the least, was a strong indication of premeditation and also bore upon the question of necessity. Finally, in her statement, while Winegar was asleep and as she approached his bed, right before she stabbed him, she said she "was not going to put up with it any more."

The necessity defense is codified in our Penal Code section 9.22. In relevant part, it provides that conduct is justified if "the actor reasonably believes the conduct is immediately necessary to avoid imminent harm." Tex. Penal Code Ann. § 9.22(1) (Vernon 1994). To be entitled to submission of the defense, a defendant must present some evidence of his reasonable belief of and affirmative evidence of imminent harm. A generalized fear of harm is not sufficient to raise the issue of imminent harm. *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex.App.--Fort Worth 1997, no pet.). Appellant's trial defense was conducted upon the theory that Winegar was forcing himself sexually upon her sister. At trial, she averred that she heard Winegar enter her sister's bedroom and shut the door, and she then heard the bed springs pop and thought Winegar was in her sister's bed. Because of these things, she thought her action was immediately necessary to protect both herself and her sister. Dr. Anthony Arden, a defense witness, testified that in his professional opinion, appellant reasonably believed her conduct was necessary to avoid imminent harm to herself and her sister.

As a general rule, determination of the reasonableness of an accused's belief is a question of fact, *Fitzgerald v. State*, 782 S.W.2d 876, 885 (Tex.Crim.App. 1990), and should be viewed from the accused's standpoint at the time he acted. *Juarez v. State*, 886 S.W.2d 511, 514 (Tex.App.--Houston [1st Dist.] 1994, pet. ref'd). A defendant is entitled to submission of an affirmative defensive instruction on every issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted. *Sanders v. State*, 707 S.W.2d 78, 80 (Tex.Crim.App. 1986).

As contrasted to appellant's trial testimony, the written statement makes no reference to any immediate need for protection and, as we have noted, gives impetus to a conclusion that the stabbing was not the result of any immediate necessity for protection, but was actually undertaken after ample time for reflection. In the face of the defense testimony, we cannot say that the content of the written confession was not relied upon by the trial judge in denying the necessity defense, nor can we say that it did not have any effect upon the jury in making its decision as to the guilt of appellant. In sum, we cannot say its admission did not affect a substantial right of appellant. Appellant's second point is sustained.

Because the sustention of appellant's second point will require a reversal of the trial court's judgment, there is no necessity to discuss the other issues presented by appellant in her original appeal and in her motion for rehearing.

Accordingly, appellant's motion for rehearing is granted, our original opinion is withdrawn and this opinion substituted. For the reasons we have stated, the judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

John T. Boyd
Chief Justice

Publish.