Dana Marie CONTRERAS, Appellant,

v.

The STATE of Texas.

No. 1682–99.

Court of Criminal Appeals of Texas.

June 27, 2001.

William R. McKinney, Jr., Amarillo, for appellant.

John L. Owen, Asst. District Attorney, Amarillo, Matthew Paul, State's Attorney, Austin, for the State.

## *OPINION*

HERVEY, J., delivered the opinion of the Court, joined by KELLER, P.J., WOMACK, KEASLER, and HOLCOMB, J.J.

A jury convicted the appellant of murder and sentenced her to 40 years confinement. At the time of the offense, the appellant was a fifteen-year-old juvenile; she was *certified and tried as an adult in* district court. Finding that her written statement was taken in violation of the Texas Family Code and was therefore inadmissible, the Court of Appeals reversed the judgment of the trial court and remanded the case for further proceedings. *See Contreras v. State*, 998 S.W.2d 656, 657 (Tex.App.Amarillo 1999, pet. granted). We find the trial court properly admitted the appellant's statement and, therefore reverse the judgment of the Court of Appeals.

Viewed in the light most favorable to the trial court's ruling admitting the appellant's written statement,[1] the evidence shows that appellant murdered her "stepfather" in the early morning hours of January 11, 1996, by stabbing him in the chest with a carving knife as he lay sleeping in bed. The police arrived at the residence at approximately 3 a.m. in response to a 911 call placed by the appellant. The appellant approached police from a field and said that she "stabbed him" after an officer asked her what had happened. The police arrested the appellant and placed her in the back of a patrol car and transported her to a duly designated juvenile office about 45 to 50 minutes after the arrest. The Court of Appeals's analysis of the delay in transporting the appellant focused on this forty-five minute period.

During this period, the police made attempts to save the victim's life, and they "secured the scene." The police did not interrogate or attempt to obtain a written statement from the appellant during this time.

The officer in charge of the crime scene, Farren, testified that trying to save the victim's life and "securing the scene" were police priorities.

> A. Our first priority is to determine whether, in fact, a crime has been committed. Once we determine a crime has been committed, then it would be the— after giving assistance to anybody who needs aid, then we would secure the scene.

This officer testified that "securing the scene" included taking steps to preserve "all the evidence at that scene" and to insure the appellant's safety and the safety of the police officers present at the scene.

---

1. *See State v. Ballard*, 987 S.W.2d 889, 891 (Tex.Cr.App.1999) citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Cr.App.1997) (setting out appellate standard of review in cases like this).

Q. Let me back up a second. Have you testified in front of this jury about going back to [appellant], shining a flashlight on her hands?

A. No, sir, I have not.

Q. Did that happen that night?

A. Yes, sir, it did.

Q. Do you remember what time that happened?

A. It was probably, oh, probably 25 minutes after we arrived. Once I had her secured in the back of the patrol car, we went ahead and approached the house. Once we determined that it was safe to enter the house, we entered and we discovered the victim in the condition he was in. We called for an ambulance to go ahead and come into the location. From viewing the victim, it was obvious that he was in very critical condition. At that time, we made a determination that we would begin first aid on the victim, moved the victim from the bed and began to do CPR on the victim. Probably three to five minutes later, the fire department arrived. They took over the first aid to the victim.

At that time, it was determined that [appellant] should be transported down to the Juvenile Division for further processing. But before we did so, I wanted [appellant] checked for any additional weapons or any other physical evidence that might connect her to this crime.

This officer testified that "securing the scene" also included taking steps to prevent the destruction of evidence.

Q. Now, you had an occasion to have a discourse with [appellant] later about some gloves; is that correct?

A. Well, after we got inside the scene and discovered what we had and after her [oral] statement that she had stabbed him, we—a decision was made that she should be transported to the Juvenile Division of the Amarillo Police Department. Prior to her being transported, I wanted her searched for any additional weapons for not only our safety, but her safety, and if she had any further evidence on her, including any blood that might have been transferred from the knife or the victim onto her. I wanted to make sure that wasn't destroyed either by simply wiping it off or wetting her hands with her tongue or any possible way she could destroy this evidence.

So we had her removed from the car. She-a metal detector wand was used to scan her for any additional metal objects, one, because she was a female, and two, because she was a juvenile.

At that time, I asked her to show me her hands, at which time she put out her hands. I shined a flashlight over them and she said, "Oh, no, I was wearing gloves."

Appellant gave a voluntary, written statement after the police transported her to a juvenile office. The trial court admitted this written statement into evidence.

The Court of Appeals held that the 45 to 50 minutes it took the police to transport the arrested appellant from the crime scene to a juvenile office was an "unnecessary delay" and, therefore, violated Section 52.02(a)(2) of the Texas Family Code.[2] *See Contreras*, 998 S.W.2d at 661. The Court of Appeals decided that the police "investigating the stabbing" was "an inadequate justification for the delay in transporting [appellant] to a duly designated juvenile office." *See id.*

The Court of Appeals also found that admission of appellant's written statement

---

**2.** Section 52.02(a)(2), in relevant part, required the police to take the arrested appel-

lant to the designated juvenile office "without unnecessary delay."

harmed her because it was inconsistent with her necessity defense at trial and, therefore, could have contributed to the trial court's decision to deny appellant's requested jury instruction on this defense. *See id.* at 661–64. This, according to the Court of Appeals, compromised "the integrity of the process leading to [appellant's] conviction." *See id.* at 664; *but cf. Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971) (shield provided by prophylactic rule requiring exclusion of voluntary and reliable statements "cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances").

Despite the harm standard the Court of Appeals purported to apply, whether the admission of the appellant's written statement had a "substantial or injurious effect" or a "very slight effect" on the jury's verdict, the Court of Appeals could not say the content of the written statement had no effect upon the jury in its determination of guilt. *See Contreras*, 998 S.W.2d at 661.

We granted the State's petition for discretionary review to decide: 1) whether the Court of Appeals erred in determining that the appellant's written statement was inadmissible because she was not transported "without unnecessary delay" to a juvenile processing office; and 2) whether the Court of Appeals erred in finding harm in the admission of said statement. Because we find that the Appellant was transported to a designated juvenile facility without unnecessary delay, we find it unnecessary to address the second ground for review.

■ Laws governing juveniles accused of delinquency have been enacted by the Legislature and are set out in Title 3 of the Family Code. *See Matter of D.M.G.H.*, 553 S.W.2d 827, 828 (Tex.Civ. App.—El Paso 1977, no writ). That title

of the Family Code is designed to serve the dual role of protecting the public while insulating children from the taint of criminality. *See Comer v. State*, 776 S.W.2d 191, 193 (Tex.Crim.App.1989). "Police officers, Courts, and others involved in the handling of juveniles are bound to comply with the detailed and explicit procedures enacted by the Legislature in that Code." *See Matter of D.M.G.H.*, 553 S.W.2d at 828. "Where the officer deems it necessary to take the child into custody, § 52.02(a) ... dictates what he must then do 'without unnecessary delay[.]'" *See Comer*, 776 S.W.2d at 194; *see also Baptist Vie Le v. State*, 993 S.W.2d 650, 655 (Tex.Crim.App.1999)(officers must follow "very specific actions" set up by the Legislature in dealing with juveniles; this case also explicitly reaffirms *Comer*); *see also Anthony v. State*, 954 S.W.2d 132, 134 (Tex.App.—San Antonio 1997)(when detaining juveniles, officers must follow § 52.02); *see also Matter of R.R.*, 931 S.W.2d 11, 14 (Tex.App.—Corpus Christi 1996, no writ)(stating that those dealing with juveniles are "bound" by the Family Code's "explicit procedures"); *see also State v. Langley*, 852 S.W.2d 708, 709 (Tex. App.—Corpus Christi 1993, pet. ref'd)(stating that the Texas Family Code dictates what officers must do when delivering juveniles to the court).

In *Comer*, a sixteen year old juvenile was arrested at 6:24 p.m., driven to a police station to pick up some forms, taken to the home of a Justice of the Peace to have warnings administered, returned to the police station where a written statement was taken, returned to the home of the Justice of the Peace to have the statement signed, and finally, at approximately 9:30 p.m., he was taken to a juvenile detention center. *See Comer*, 776 S.W.2d at 192–93. The *Comer* court found that this police action violated Family Code

§ 52.02(a) and as a result, the statement taken should not have been admitted into evidence. *See id.* at 196–97. While the rules in *Comer* apply when juveniles are taken into custody, the facts before us are distinguishable—no interrogation of the juvenile took place before Family Code § 52.02(a) compliance had been met by the officers involved and officers "immediately" determined that compliance with § 52.02(a) was necessary. There were no attempts by the police to interrogate the appellant and no police action taken that could be construed as coercive before they complied with the requirements of § 52.02(a) of the Family Code.

Section 52.02(a)(2) requiring the police to transport an arrested juvenile to a designated juvenile office without "unnecessary delay" by its very terms contemplates that "necessary" delay is permissible. This can only be determined on a case by case basis. The issue that we address *de novo* in this case is whether the 45 to 50 minute delay attributable to police efforts to save the victim's life and to police efforts to "secure the scene" is a "necessary" delay. *See Guzman,* 955 S.W.2d at 88–90 (Courts of Appeals decisions in cases like this may be reviewed *de novo* by this Court).

We hold that the *de minimis* 45 to 50 minute delay in this case attributable to these police efforts is a "necessary" delay. No one should dispute that delay attributable to trying to save the victim's life was a "necessary" delay. The Court of Appeals failed to factor this into its analysis of the "unnecessary delay" issue. *See Contreras,* 998 S.W.2d at 661 (deciding only that police "investigating the stabbing" was inadequate justification for the delay).

Characterizing the delay as attributable only to the police "investigating the stabbing" does not thoroughly account for the record evidence. The evidence supports a finding that the delay in this case was also attributable to the police "securing the scene." The trial court could have reasonably inferred from the testimony set out above that "securing the scene" was "necessary" to preserve the integrity of the crime scene and to prevent the destruction of evidence. This legitimate and necessary police activity of "securing the scene" likewise justifies the *de minimis* delay in this case.

Our decision in this case is consistent with Family Code policies discussed in this Court's decision in *Comer.* Unlike *Comer* where the police interrogated the arrested juvenile suspect for three hours before the police complied with relevant Section 52.02 Family Code provisions, the police in this case "immediately" decided upon the appellant's arrest that compliance with these statutory provisions was required. *See Comer,* 776 S.W.2d at 193–94, 196 (Section 52.02 Family Code provisions must be complied with "immediately" upon taking a juvenile into custody).

Police involvement with the appellant was narrowly circumscribed to "securing the scene" which was necessary and legitimate police activity. *See id.* at 196 (Family Code provisions intend to narrowly circumscribe police involvement with arrested juveniles). The police did not stray beyond "securing the scene" by interrogating and attempting to obtain a statement from appellant during the 45 to 50 minutes that she was detained in the back of the patrol car. A contrary decision would fail to properly weigh the "competing purposes" in cases like this. *See id.* at 193 (discussing Family Code's "competing purposes").

Judge Johnson's dissenting opinion misapplies the standard of review by viewing the evidence in the light least favorable to

the trial court's ruling admitting appellant's statement. The dissenting opinion does this by focusing on evidence that arguably does not support the trial court's ruling and by ignoring evidence that supports the trial court's ruling.

For example, the dissenting opinion discounts what it characterizes as "testimony that some of the officers attempted to help treat the victim," and emphasizes some testimony "that trained medical personnel were at the scene and treating the victim early on." *Contreras*, at 183 (Johnson, J., dissenting). This, however, in no way undermines a finding that some of the delay was due to police efforts to save the victim's life. Moreover, the evidence set out in the dissenting opinion about what the police were doing at the crime scene arguably lends support to a finding that these were police efforts to "secure the scene." Examples of this are photographing the crime scene and searching the field for weapons to prevent their possible loss.

Notwithstanding this, the record in this case is not at all clear about which officer was doing what at which time. Even the dissenting opinion cannot determine from this record the number of police vehicles at the scene. *See Contreras*, at 183. What is clear, however, is that the testimony of the officer in charge of the crime scene, Farren, supports findings that the entire delay was attributable to police efforts to save the victim's life and to "secure the scene" which included steps to prevent the destruction of evidence and to provide for the safety of appellant and the officers at the scene. The dissenting opinion does not discuss Farren's testimony and it makes no claim that Farren's testimony fails to

support these findings even though it does acknowledge that efforts to "secure the scene" and to save the victim's life is a necessary delay.

The judgment of the Court of Appeals is reversed and this case is remanded there for further proceedings consistent with this opinion.

PRICE, J., concurs in the judgment of the Court.

MEYERS, J., filed a dissenting opinion.

JOHNSON, J., filed a dissenting opinion, joined by HOLLAND, J.

MEYERS, J., dissenting.

The majority says "in cases like this," the appropriate standard for review is set forth in *Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App.1997). But *Guzman* was not a "case like this." *Guzman* was a Fourth Amendment case. This is a case involving the application of a state statute. These are not the same. Discretionary review of this case should not have been granted, and I would hold our granting of review was improvident. This Court ought to take another look at the principles articulated in *Arcila v. State*, 834 S.W.2d 357 (Tex.Crim.App.1992).[1]

In *Guzman*, we granted review to decide whether the Court of Appeals had erred in its application of law to facts under the Fourth Amendment. In determining the appropriate standard of review, we relied solely on the United States Supreme Court's opinion in *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). *Ornelas*, also a Fourth Amendment case, stated the following with respect to review of issues under the Fourth Amendment: "the legal

---

1. The status of *Arcila* is somewhat unclear. The Court expressly overruled it in *Guzman*, but only after saying that the principles discussed in *Arcila* were not really implicated in

*Guzman. Guzman*, 955 S.W.2d at 89–90. At any rate, its policies seem to have fallen out of favor.

rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles." *Guzman*, 955 S.W.2d at 87 (quoting *Ornelas*). But *Guzman* has been taken beyond the confines of the Fourth Amendment.[2] It's as though this Court is compelled to "maintain control of, and [ ] clarify the legal principles" involved in virtually every issue that comes before us, particularly if the result is one we do not like.

On the last day of our judicial session exactly nine years ago, Judge Benevides,[3] writing for a majority of this Court, described the scope of our role as a court of discretionary review:

> Like this Court, the courts of appeals are duty-bound to uphold the constitution and laws of this State and of the United States. So long as it appears that they have discharged that duty conscientiously by impartial application of pertinent legal doctrine and fair consideration of the evidence, it is our duty in turn to respect their judgments. Our principal role as a court of last resort is the caretaker of Texas law, not the arbiter of individual applications. When different versions of the law, including unsettled applications of the law to significantly novel fact situations, compete for control of an issue, it is finally the job of this Court to identify and elaborate which is to control thereafter.

But, except under compelling circumstances, ultimate responsibility for the resolution of factual disputes lies elsewhere. See *Meraz v. State*, 785 S.W.2d 146, 152–154 (Tex.Cr.App.1990) (Courts of appeals are the final arbiters of fact questions); *Meeks v. State*, 692 S.W.2d 504, 510 (Tex.Cr.App.1985) (Voluntariness of consent is a fact question).

\* \* \* \*

. . . the only basis for complaint here is that the Dallas Court of Appeals somehow managed to get it wrong. Even if our own decision might have been different on the question presented, we cannot accept the proposition that an appellate court's judgment ought to be subject to reversal on such basis, at least when the evidence is sufficient to support it. Doing so only tends to undermine the respective roles of this and the intermediate courts without significant contribution to the criminal jurisprudence of the State. This Court should reserve its discretionary review prerogative, for the most part, to dispel any confusion generated in the past by our own case law, to reconcile settled differences between the various courts of appeals, and to promote the fair administration of justice by trial and appellate courts throughout Texas. See Tex.R.App.P. 200(b), (c); *Degrate v. State*, 712 S.W.2d 755 (Tex.Cr.App. 1986).

. . . we decline, to substitute our own judgment on ultimate questions of fact for that of the lower courts.

---

**2.** Instead of confining *Guzman*'s standard of review to Fourth, or even Fifth, Amendment cases, the Court has applied it to other constitutional and nonconstitutional issues. *See Ex parte Martin*, 6 S.W.3d 524 (Tex.Crim.App.1999)(conducting *de novo* review under *Guzman* to question of whether there was "good cause" for State's delay of indictment under Code of Criminal Procedure article 28.061); *State v. Munoz*, 991 S.W.2d 818, 821 (Tex.Crim.App.1999)(conducting *de*

*novo* review under authority of *Guzman* in speedy trial context). The Court has continued to recognize the abuse of discretion standard as applicable to review of evidentiary rulings. *Rankin v. State*, 974 S.W.2d 707, 717–18 (Tex.Crim.App.1996)(opinion on reh'g).

**3.** Judge Benevides now sits on the United States Court of Appeals for the Fifth Circuit.

*Arcila v. State,* 834 S.W.2d 357, 360–61 (Tex.Crim.App.1992).

A lot can happen in almost a decade. This is this last day or our 2000–2001 session. We do not currently seem to have a notion of our role within the system that bears any semblance to that described by Judge Benevides nearly a decade ago. Applying *Guzman* indiscriminately, and conducting *de novo* reviews without examining the appropriateness of such review in the context at issue,[4] we utilize our powers of discretionary review in a manner that resembles that of a super-appellate court.

The Court of Appeals did its job in this fact-bound case. The court applied the statute to the facts and decided there was unnecessary delay. The appeals court did not misconstrue the statute. The State, and the majority, simply disagree with the conclusion reached by that court. A determination of what is "unnecessary delay" under the statute is subjective and calls for a case-by-case assessment. This is precisely the kind of assessment that falls smack within the realm of appellate review by our courts of appeals. We should not have granted review here. We should now hold that this case was improvidently granted. I dissent.

JOHNSON, J., joined by HOLLAND, J. dissenting.

I respectfully dissent. Section 52.02(a) of the Texas Family Code provides that a child taken into custody must be taken, without "unnecessary delay," to a juvenile processing office. The majority characterizes the delay in this case as *de minimis* and appears to hold that, as a general matter, a delay of forty-five to fifty minutes is "necessary" when due to police efforts to save a victim's life and secure a crime scene. *Ante,* at 184 – 85. If the officers in this case were *necessarily* involved in such activities, the majority's holding would stand up to scrutiny. The record shows, however, that this is not the case.

It is true that the delay here was significantly shorter than in other cases in which unnecessary delay was found. *Comer v. State,* 776 S.W.2d 191 (Tex.Crim.App.1989) (delay of about three hours); *In re D.M.G.H.,* 553 S.W.2d 827 (Tex.Civ.App. 1977, no writ) (delay of almost ten hours). However, as both the majority and the court of appeals note, whether there was an "unnecessary delay" in taking a minor to a juvenile processing center is a determination which must be made on a case-by-case basis. *Ante,* at 185; *Contreras v. State,* 998 S.W.2d 656, 660 (Tex.App.— Amarillo 1999). Yet, the majority fails to make its determination on this basis. The evidence, as set out in the record of this case, demonstrates that the delay was unnecessary.[1]

According to the testimony presented at trial, Officers Farren and Coleman were

---

4. The instant case involves the application of facts to the law under a statute. I have found no case discussing the appropriate standard of review for statutory construction or for the application of law to a statute. It may be that *de novo* review is appropriate. Or perhaps statutes should be treated like rules of evidence, in which case abuse of discretion is appropriate. I don't really know and I decline to invest more time to research this question as a lone voice, at this juncture.

1. The majority asserts that I have "misapplie[d] the standard of review by viewing the evidence in the light least favorable to the trial court's ruling...." *Ante,* at 185 – 86. To the contrary, by accepting as true everything testified to by the state's witnesses in support of the claim of "necessary delay," I have applied the appropriate standard of "in the light most favorable to the trial court's ruling."

the first officers to arrive on the scene. At about 3:00 a.m., they got out of their vehicles and were approached by appellant. After appellant made incriminating statements to the officers, the officers decided that she should be transported to the Juvenile Division of the Police Department. Appellant was taken to the officers' car and searched using a wand metal-detector. Officer Heaster and his partner, Officer Wertz, arrived at the scene at about 3:05 a.m. Appellant was placed in their patrol car. Employees of the Fire Department were already at the scene and were attempting to treat the victim when Charles Olsen and his partner, employees of Amarillo Medical Services, arrived at the scene and began treating the victim. Officer Haley collected evidence, and photographed, videotaped, and did a sketch of the crime scene.

Heaster testified that he went inside the residence briefly to try to assist with first aid, but he did not stay because the Fire Department and Amarillo Medical Services were already present and working on the victim. Within a few minutes, the victim was taken from the scene. Heaster then spent ten to fifteen minutes taking photographs inside the residence and searching the area from where appellant had been seen coming. Heaster and another officer, Sergeant Trupe, went to the school grounds across from the residence and spent about another three to five minutes searching for any possible evidence. Heaster then spoke with appellant's sister for a minute or less and then went back to his patrol car. He searched appellant and then took her to the Juvenile Division. However, Heaster also testified that "mainly" his duty was to sit with appellant in the patrol car.

Although there was testimony that some of the officers attempted to help treat the victim, it is clear that trained medical personnel were at the scene and treating the victim early on. There were at least six officers on the scene, with at least four present within five minutes of the first contact with appellant, and it is clear that the police were familiar with the requirements of § 52.02. Considering the number of officers at the scene(6), the number of police vehicles at the scene (4–5), the early arrival of paramedics, the fact that part of the delay included a search of school grounds across from the scene, and Heaster's testimony that he merely sat with appellant in the patrol car for some period of time, the delay between when appellant was taken into custody (about 3:05 a.m.) and when she was finally transported from the scene (about 3:46 a.m.) to the Juvenile Division (about 3:55 a.m.) cannot be justified as "necessary." Given all the evidence, I cannot say that the court of appeals erred in holding that the delay in taking appellant to the Juvenile Division was unnecessary.

I would affirm the judgment of the court of appeals. I dissent.