**In the Matter of J.D.**

No. 04–00–00689–CV.

Court of Appeals of Texas, San Antonio.

Oct. 10, 2001.

Jose M. Guerrero, Law Offices of Jose M. Guerrero, Robert L. Shaffer, Law Offices of Robert L. Shaffer, San Antonio, for Appellant.

Enrico B. Valdez, Assistant Criminal District Attorney, San Antonio, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, PAUL W. GREEN, Justice, and SARAH B. DUNCAN, Justice.

Opinion by SARAH B. DUNCAN, Justice.

J.D. appeals his conviction and sentence for aggravated assault and conspiracy to murder. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On the morning of May 17, 2000, J.D. and another juvenile were spotted by a neighbor in the vicinity of Ogden Elementary School and Irving Middle School. According to the neighbor, the juveniles were carrying a rifle in a backpack and attempting to hide the weapon in an alley. Concerned, the neighbor contacted the police and reported the incident.

An investigation led San Antonio police to a house on 3015 Perez Street—J.D.'s house. Under the belief he was dealing with a burglary in process, Officer Gilberto Gallegos, accompanied by Officer Javier Hernandez, entered and searched the residence after knocking and announcing himself but without first obtaining a warrant. Almost immediately after entering the residence, Gallegos was confronted by J.D. pointing a .22 caliber rifle at him. Gallegos drew his weapon and a stand-off ensued with each shouting at the other to drop his weapon. J.D. eventually surrendered the rifle. After J.D. was secured and handcuffed in the living room, Gallegos asked some basic questions: "name, date of birth, where do you live." This is when the officers first learned J.D. lived at 3015 Perez Street.

As Hernandez was handcuffing J.D., he noticed a rifle leaning against the living room sofa. Hernandez asked J.D. if there were any other weapons in the house. J.D. said there was a cross-bow in a backpack. Hernandez searched the backpack

that was on the sofa next to J.D. but only found a box of .22 caliber bullets. Hernandez asked J.D. where the cross-bow was and J.D. indicated that it was in a black back-pack in his bedroom. Hernandez located the black back-pack and found the cross-bow and what appeared to be home-made arrows. Hernandez also recovered a handful of loose bullets from J.D.'s pocket. When Hernandez asked J.D. what the bullets were for, J.D. said the bullets were for some kids at school who had been messing with him; that he was upset and mad because his girlfriend had broke up with him. Hernandez then asked if there was anyone else in the house and J.D. responded "no, only him." A witness, however, later told Hernandez he thought he saw two juveniles enter the house. Based on this information, Hernandez, assisted by Officer James Shirley, searched the house for the second juvenile, who was eventually found hiding in the bathroom armed with a handgun.

After the second juvenile was found and both were in custody, Detective Shirley Owen, a member of the San Antonio Police gang unit, briefly questioned the juveniles to determine if either were involved in gang activity. At some point, J.D.'s friend told Owen that he did not want to go to school and shoot anybody. J.D., however, told her he was tired of being humiliated and picked on by people at school. When Owen asked J.D. what the bullets were for, J.D. responded that they were going to use them to shoot ·at the school. Owen also asked J.D. why he wasn't in school and J.D. responded that he and his friend were on their way to school that morning when they decided to return to J.D.'s house to get more ammunition.

J.D. was charged with one count of aggravated assault with a deadly weapon against a public servant and two counts of conspiracy to commit capital murder. J.D.

filed three motions to suppress his written and oral statements and all other illegally obtained evidence. A hearing was held and the trial court suppressed all of the oral statements J.D. made to Detective Owen except for one he made spontaneously while Owen was talking to the other juvenile. All other motions to suppress were denied. J.D. subsequently plead true to each of the counts and was sentenced by the trial court to a fifteen-year determinate sentence and committed to the Texas Youth Commission until his twenty-first birthday. J.D. appeals the trial court's denial of his motions to suppress.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress for abuse of discretion. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996). Under this standard, we view "the evidence in the light most favorable to the trial court's ruling," affording almost total deference to findings of historical fact supported by the record. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). However, when the resolution of the factual issues does not turn upon an evaluation of credibility or demeanor, we review de novo the trial court's determination of the applicable law as well as its application of the law to the facts. *Id.*

## WARRANTLESS SEARCH

In his first point of error, J.D. argues the trial court erred in denying his motion to suppress because the police entered his house without a warrant, probable cause, or exigent circumstances in violation of his rights under the Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution. He therefore maintains his written statement and other illegally obtained evidence should be excluded under article 38.23 of

the Texas Code of Criminal Procedure. In response, the State argues the search was proper under the emergency doctrine. We agree with the State.

### Applicable Law

■■■ The Fourth Amendment does not prohibit police officers from making an immediate warrantless search when they reasonably believe a person is in need of immediate aid. *Brimage v. State,* 918 S.W.2d 466, 500–501 (Tex.Crim.App.) (op. on reh'g), *cert. denied,* 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 66 (1996). The "emergency doctrine" applies the "exigent circumstances" exception to the Fourth Amendment's warrant requirement to render a warrantless entry and search reasonable if the officers "need to act immediately to protect or preserve life or to prevent serious injury." *Bray v. State,* 597 S.W.2d 763, 764 (Tex.Crim.App.1980). The State bears the burden of justifying the search under the emergency doctrine. *See Amores v. State,* 816 S.W.2d 407, 413 (Tex. Crim.App.1991). To justify the search of a residence under the emergency doctrine, the State must show 1) that the officers had probable cause to search the residence, and 2) that obtaining a search warrant was impracticable because the officers reasonably believed there was an immediate need to act in order to protect or preserve life or to prevent serious bodily injury. *See Crane v. State,* 786 S.W.2d 338, 346 (Tex.Crim.App.1990). We use an objective standard in assessing the reasonableness of the officer's belief and consider "the facts and circumstances known to the police at the time of the search." *Colburn v. State,* 966 S.W.2d 511, 519 (Tex.Crim. App.1998).

### Discussion

■■■ The parties do not dispute the facts and circumstances surrounding the police's search of J.D.'s home. We therefore review de novo the trial court's denial of J.D.'s motion to suppress on this ground. At the suppression hearing, Officer Gallegos testified that at 8 a.m. he responded to an earlier police dispatch call that two juveniles had been spotted in the vicinity of the Ogden Elementary School carrying a rifle. While investigating the call, Gallegos spoke with two witnesses. The first witness, Priscilla Quintanilla, was the person who first reported seeing the juveniles with a rifle in a nearby alley. The second witness, James Gonzalez, approached Gallegos as he was searching the alley. Gonzalez said he saw two juveniles go into the yard on the other side of the alley behind his house. Gonzalez thought the juveniles had gone into the house located on the same property.

Based on this information, Gallegos, now joined by Hernandez, entered the back yard of 3015 Perez Street and proceeded towards the house. As they moved towards the house, they heard loud noises coming from within the house—what sounded like running and an object hitting the wall. Concerned, the officers proceeded to the front door. Gallegos immediately noticed the front door had been tampered with—the screen on the front door had been torn, a window was broken, and the front door was slightly ajar. At this point, the officers believed they were dealing with a burglary and that the two juveniles with the rifle were possibly involved. Hernandez returned to the back of the house in the event the burglars tried to escape through the back door. Gallegos remained at the front door. With his metal night stick, Gallegos pounded on the door, yelling loudly "Police, come out." No one responded.

We conclude these facts were sufficient to establish Gallegos had probable cause to believe a crime had been committed and

780

the two juveniles seen carrying a rifle were connected with a burglary. *See Castillo v. State,* 818 S.W.2d 803, 805 n. 4 (Tex.Crim.App.1991) (defining probable cause). Thus, the police had sufficient probable cause to search J.D.'s home. The pertinent issue therefore is whether exigent circumstances existed to justify Gallegos' decision to enter and search J.D.'s home without first obtaining a warrant.

Officer Gallegos testified his decision to enter the house without a warrant was based on his belief a burglary had been committed or was in progress and his fear that there may have been someone home when the burglars broke in. He therefore reasoned it was his duty to "check the house to see if anybody had been in there for their safety." J.D. contends that based on these facts, it was unreasonable for Gallegos to "suspect, let alone believe ... that anyone inside the house was in danger." We disagree.

The facts of this case closely parallel *United States v. Johnson,* a Sixth Circuit case cited with approval by the Texas Court of Criminal Appeals in *Brimage. See Brimage,* 918 S.W.2d at 501 (citing *United States v. Johnson,* 9 F.3d 506 (6th Cir.1993)), *cert. denied,* 512 U.S. 1212, 114 S.Ct. 2690, 129 L.Ed.2d 821 (1994). *Johnson* involved "a warrantless search by police responding to a report of a burglary," which was held to be "justified on exigent circumstances grounds." *Brimage,* 918 S.W.2d at 501. Like the present case, the police in *Johnson* "observed, upon arrival at the scene of the reported crime, broken windows and individuals moving around inside the residence who failed to identify themselves." *Id. Johnson* only differs from the present case in that the police there were responding to a burglary reported by the defendant's neighbor, who had seen the individuals crawl through the window of the defendant's residence. Al-

though no one here actually observed the juveniles break into the house, the two armed juveniles had been seen entering the yard of 3015 Perez Street and Gallegos had probable cause to believe a burglary was in progress at this same address. Taking into account all the information known to Gallegos at the time he searched J.D.'s home, a reasonable police officer could have concluded an emergency existed and there was a reasonable possibility someone inside the house was in danger or in need of assistance. We therefore overrule J.D.'s first point of error.

### DESIGNATED JUVENILE PROCESSING OFFICE

In his second point of error, J.D. contends the trial court erred in admitting his written statement into evidence because he was taken to places other than a designated juvenile processing office under section 52.025 of the Texas Family Code.

#### Discussion

■ Because J.D. was a juvenile when he made the written statement, the Texas Family Code governs its admissibility. *See Comer v. State,* 776 S.W.2d 191, 196 (Tex.Crim.App.1989). When a child is taken into custody, he may be temporarily detained in a designated juvenile processing office. TEX. FAM.CODE ANN. § 52.025 (Vernon Supp.2001).

Section 52.025(a) of the Family Code further provides that:

The juvenile court may designate an office or a room, which may be located in a police facility or sheriff's offices, as the juvenile processing office for the temporary detention of a child taken into custody under Section 52.01 of this code. The office may not be a cell or holding facility used for detentions other than detentions under this section. The juvenile court by written order may prescribe the conditions of the designation

and limit the activities that may occur in the office during the temporary detention.

*Id.* § 52.025(a). A juvenile may be detained in a juvenile processing office for "the receipt of a statement by the child...." *Id.* § 52.025(b)(5).

### 1. J.D.'s Living Room

■ J.D.'s specific complaint is twofold. He first complains the police illegally detained him in the living room of his house because his living room is not a designated processing office. J.D. maintains that because he was taken into custody in his bedroom, police should not have moved him to the living room before taking him to a juvenile processing office. We disagree.

Officers Gallegos and Hernandez testified they secured and handcuffed J.D. in the living room. This is also where J.D. was read his rights. Even if J.D. could prove he was taken into custody in his bedroom, the mere movement of J.D. from his bedroom to the living room within the same house would not violate section 52.02(a). In other cases where this same issue was raised, movement of the defendant was substantial, such as transporting the defendant somewhere away from the place he was taken into custody. *See, e.g., Roquemore v. State,* 11 S.W.3d 395, 400 (Tex.App.—Houston [1st Dist.] 2000, pet. granted) (instead of taking defendant directly to a juvenile processing office, officer took defendant to place where defendant said stolen property was hidden); *In re G.A.T.,* 16 S.W.3d 818, 825 (Tex.App.—Houston [14th Dist.] 2000, pet. denied) ("after taking the four juveniles into custody, [the officer] took them back to the scene of the crime for identification rather than taking them directly to a designated juvenile processing office."). This argument is therefore without merit.

### 2. Judge Teniente's Office

■ Next, J.D. argues he was illegally detained in Judge Richard Teniente's office because the order designating "the offices, hearing rooms and courtrooms of the Magistrates of Bexar County," is too general in that it does not designate a specific area to be used exclusively for processing juvenile offenders. He further contends Judge Teniente improperly participated in the taking of J.D.'s statement. We disagree.

For support that the designation is too general, J.D. relies on *Anthony v. State,* 954 S.W.2d 132 (Tex.App.—San Antonio 1997, no pet.). However, *Anthony* is distinguishable and, contrary to J.D.'s assertion, this court did not hold in *Anthony* that "the general designation of police stations and magistrates' offices" was improper. *Id.* at 135–36. Instead, we concluded the defendant's statement was taken in violation of the Family Code because the homicide office had not been designated solely for the purpose of processing juveniles; the magistrate who informed Anthony of his rights was unaware of any special designation making his courtroom a juvenile processing office; and police failed to contact a juvenile officer. *Id.* at 134. Therefore, the court determined the police procedure failed to "supply the child with protection against the stigma of criminality or exposure to adult offenders." *Id.* at 136. *See also Comer,* 776 S.W.2d at 196 (reasoning behind the rule is to "avoid the 'taint of criminality' inherent in interrogation conducted at the unsupervised discretion of law enforcement officers.").

Unlike in *Anthony,* Judge Teniente testified he had been designated as one of the officials before whom juveniles may be

brought when taken into custody.[1] The judge also testified that as part of his official duties as a designated official, he administers warnings to juveniles as required by the Family Code. Moreover, there is no evidence J.D. was subjected to the "taint of criminality." *See id.* The record shows J.D. was arrested and taken into custody in his home while his parents were present. He was then transported to 214 W. Nueva, Room 109, a place designated as a juvenile processing office. His parents were also present at the processing office.

Detective Thomas Matjeka testified he walked J.D. across the street to the office of Judge Teniente, who informed J.D. of his rights and gave him the warnings required by the Family Code. *See* TEX. FAM. CODE ANN. § 51.095(a)(1)(A) (Vernon Supp. 2000). Matjeka then returned J.D. to 214 W. Nueva, Room 109, took J.D.'s statement, and returned to Judge Teniente's office where J.D. signed the completed statement in the judge's presence as required by section 51.095(a)(1)(B).

Matjeka testified this was the procedure normally used when taking a juvenile's statement and that he did not accompany J.D. inside Judge Teniente's office. Judge Teniente testified only he and his clerks were present in his office; no law enforcement personnel or adult offenders were present. Thus, unlike *Anthony*, the purpose of requiring a specially designated area to protect juveniles from exposure to adult offenders and the stigma of criminality was achieved. *See Williams v. State*, 995 S.W.2d 754, 758–59 (Tex.App.—San Antonio 1999, no pet.) (distinguishing *Anthony* using similar reasoning). We there-

fore hold the trial court did not err in overruling J.D.'s motion to suppress on this basis. Accordingly, we overrule J.D.'s second point of error.

### DELAY IN TRANSPORTING AND PROCESSING JUVENILE

In his third point of error, J.D. argues the trial court erred in denying his motion to suppress because: (1) he was not delivered to the juvenile processing center without unnecessary delay; and (2) he was detained for an impermissible period of time at the juvenile processing center before being taken to a juvenile detention facility.

### *Discussion*

### *1. Delay in Transporting J.D. to the Juvenile Processing Office*

■ Section 52.02(a) of the Texas Family Code provides that a child taken into custody must be taken, without "unnecessary delay," to a juvenile processing office. *See* TEX. FAM.CODE ANN. § 52.02(a) (Vernon Supp.2000). J.D. argues the length of time he was detained in his home before being transported to the juvenile processing office violated section 52.02(a). We disagree.

This section of the Family Code "by its very terms contemplates that 'necessary' delay is permissible." *Contreras v. State*, 67 S.W.3d 181 (Tex.Crim.App. 2001). Whether the delay is necessary is "determined on a case by case basis." *Id.* The Court of Criminal Appeals in *Contreras* held that police activities taken to secure the scene and save a victim's life are not only legitimate but necessary and there-

---

**1.** During the suppression hearing, the State showed Judge Teniente a 1997 designation order signed by Judge Andy Mireles. This is the order that J.D. contends is too general because it fails to designate a specific place to

be used exclusively for juvenile processing. However, Judge Teniente testified his office had been designated by a later order signed by District Court Judge Carmen Kelsey.

fore justify brief delays. *Id. Contreras* involved a forty-fifty minute delay. Therefore, the issue we must decide is whether the delay in this case was necessary.

The parties dispute the time J.D. was taken into custody and the total length of the delay. J.D. argues it was a three to four hour delay. The State, on the other hand, contends the delay was one and one-half to two hours. As the State notes, the record does not provide a detailed chronology of the events that took place that morning. Consequently, we do not know exactly how long J.D. was in custody before being taken to the juvenile processing office. At most, it appears J.D. could have been in custody for two or two and one-half hours before he was logged in at the juvenile processing office between 11:10 a.m. and 11:15 a.m.

During this time, three things happened: the officers secured the scene, J.D. was allowed to speak with his parents, and a gang unit detective questioned J.D. and the other juvenile. Of these, the latter took only twenty minutes. It is unclear, though, exactly how long the police spent securing the scene and how long J.D.'s parents were permitted to talk to him.

Nevertheless, the evidence presented at the suppression hearing suggests much of the delay was attributable to the police securing the scene, which included steps the police took to search the house for weapons and the second juvenile who was thought to be armed and hiding somewhere in the house. Police eventually found the juvenile hiding in the bathroom where a standoff ensued with the juvenile threatening to kill himself. Thus, these steps were necessary not only for the safety of the officers at the scene but also for the safety of the two juveniles. *See id.* at 182.

J.D.'s statements regarding his plan to shoot and kill some children at a nearby school created further concern for public safety. *See id.* at 184. (citing *Comer v. State* and discussing the competing concerns of "protecting the public while insulating children from the taint of criminality"). With this concern in mind, the police, out of an abundance of precaution, questioned J.D. briefly before leaving the house to determine if there were other co-conspirators, whether the incident was gang related, and who were the intended targets of the crime. To protect J.D.'s rights, the police administered *Miranda* warnings twice before questioning him. To protect him from the "taint of criminality," the police had a detective dressed in civilian clothes question J.D. At no time during this period did the police attempt to obtain a written statement from J.D. And, as stated previously, Detective Owen spent a total of only twenty minutes questioning J.D. and the other juvenile.

Despite legitimate police concern for public safety, the trial court suppressed all of J.D.'s oral statements to Detective Owen in response to her direct questioning, but admitted a statement he made spontaneously while she was questioning the other juvenile. Nevertheless, the court concluded the delay at J.D.'s house was justified because of the public safety issues involved. Viewing the evidence in the light most favorable to the trial court's ruling, we hold that the trial court did not err in concluding the delay in transporting J.D. to the juvenile processing office was necessary under the circumstances.

### 2. J.D.'s Detention at the Juvenile Processing Center

J.D. next contends his written statement should have been suppressed because he was detained for an impermis-

sible period of time before being taken to the juvenile detention center. We disagree.

Section 52.025(d) "contemplates that an officer may first, for a maximum of six hours, take a juvenile to a processing center" before delivering the juvenile to a juvenile detention center or one of the other five options listed in section 52.02(a). *Baptist Vie Le v. State*, 993 S.W.2d 650, 653–54 (Tex.Crim.App.1999). Thus, the issue here is whether J.D. was detained at the processing office for longer than six hours.

J.D. was logged in at the juvenile processing office between 11:10 and 11:15 a.m. Matjeka testified he had completed taking J.D.'s statement by 4:50 p.m. J.D. signed his statement in Judge Teniente's office at 5:14 p.m. and was then taken immediately back to the juvenile processing office to be booked at the Bexar County Juvenile Detention Center. J.D. concedes the record is silent as to the time he was actually delivered to the juvenile detention facility. Based on the available evidence, we hold the trial court correctly concluded J.D.'s detention at the processing office was within the parameters set forth in the Family Code and his written statement was therefore admissible. Accordingly, we overrule J.D.'s final point of error.

## CONCLUSION

For the reasons stated, we affirm the trial court's judgment.