NO. 07-97-0487-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



NOVEMBER 27, 2001



______________________________




DANA MARIE CONTRERAS, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;



NO. 37,880-D; HONORABLE DON EMERSON, JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

ON REMAND FROM COURT OF CRIMINAL APPEALS (ON REHEARING)


 Following a remand from the Court of Criminal Appeals, we now affirm the judgment
of the trial court in this cause. The procedural history underlying this opinion began when
this court reversed the judgment of the trial court. Contreras v. State, 998 S.W.2d 656
(Tex.App--Amarillo 1999) (on reh'g). Subsequently, the Court of Criminal Appeals granted
the State's petition for review and, thereafter, reversed and remanded the case back to this
court. Contreras v. State, No. 1682-99 (Tex.Crim.App. 2001). 

 In her initial brief, appellant raised seven issues for our review. The first issue was
decided in our original opinion and reported at Contreras v. State, 998 S.W.2d 656
(Tex.App--Amarillo 1999) (on reh'g). For the reasons we stated in that opinion, we remain
convinced that our overruling of that issue was correct and we reiterate that ruling. In that
opinion, we found appellant's second issue dispositive of her appeal and did not address
the remaining five issues. The Court of Criminal Appeals' holding necessitates that we
now reconsider the second issue and decide the remaining five. 

 The nature of appellant's challenges requires us to discuss the facts in some detail. 
On January 11, 1996, while sleeping, the victim, Neal Winegar, was fatally stabbed by
appellant. Winegar was involved and lived with Kenna Andrews, appellant's mother. 
Kenna testified that she and Winegar met in August 1993, and began living together in
October of that same year. However, friction developed between appellant and Winegar,
and in December 1994, Kenna asked Winegar to move out. Then, in May 1995, appellant
went to live with her stepfather and the next month, Winegar moved back in with Kenna
and appellant's sister, Sueletta Andrews. In November 1995, appellant moved back in with
Kenna. From that time until Winegar's death, the four lived together. In her testimony,
Kenna averred that although appellant and Winegar were always "at odds," Winegar was
never violent towards appellant. She also testified that Winegar left all the discipline of
the girls to her.

 In her testimony, Kenna recounted the events occurring on January 10 and the early
morning hours of January 11, 1996. She said that Winegar had taken appellant to school
earlier on January 10. Later in the day, because appellant had just transferred to a new
school, Winegar brought over a gas bill to prove appellant's residence. Winegar cooked
dinner for the family that evening, but appellant did not join them. Sueletta went to bed
between 8:30 and 9:00 p.m. Later, between 11:30 p.m. and 12:00 a.m., Kenna and
Winegar also retired.

 On January 11 about 1:00 a.m., Kenna was awakened by Winegar, who asked her
to speak to appellant. (1) Pursuant to that request, she went to appellant's room and told her
to go to bed. The next thing Kenna remembered was that Winegar, moaning, rolled into
her on the bed. About the same time, she heard the front door shut and, thinking that
appellant might have run away from home as she had done before, Kenna went to check
appellant's bedroom. As she suspected, appellant was gone. Before calling the police to
report appellant's absence, Kenna went to the bathroom, at which time she noticed blood
on her nightgown. She turned on her bedroom light to see where the blood came from and
saw Winegar lying in a pool of blood. Kenna went to call 911 to report Winegar's condition
but as she did so, she noticed the receiver was off the hook and the 911 operator was
already on the line. Winegar was taken to the hospital where he died an hour to an hour
and a half later.

 Apparently receiving a call from 911 about 3:00 a.m. on January 11, the Amarillo
police dispatcher sent Lieutenant Kenneth Farren to Kenna's residence. As Farren
arrived at the residence, appellant, apparently coming from a deserted schoolyard to the
west of the house, approached and told the officer she was the one who called, and said,
"[h]e's been stabbed." When asked who the victim was, she replied that it was her
"stepfather." When Farren asked appellant "[y]our father stabbed your mother or your
mother stabbed your father," her reply was, "I stabbed him." Because she was a juvenile,
Farren said he did not question her further, but put her in a patrol car while an
investigation ensued. Later, as police prepared to take her to the police station, Farren
checked her for weapons as well as for physical evidence, such as any transfer of blood
from the knife or the victim that might connect her with the crime scene. However, when
asked to display her hands, appellant remarked, "[o]h no, I was wearing gloves."

 The officers transported her to the police station about 3:46 a.m. and, upon their
arrival at approximately 3:54 or 3:55 a.m., they took her to the juvenile division. Potter
County Justice of the Peace Terry Miller arrived sometime thereafter, gave her juvenile
warnings and, at 5:15 a.m., both Judge Miller and appellant signed a form acknowledging
receipt of the warnings. Detective Terrance Tracy then took a written statement from
appellant which was completed at 6:05 a.m. About 9:25 a.m., Municipal Judge Donna
Clayton came to the police station. A detailed discussion with appellant resulted in her
being convinced that appellant understood the nature and contents of her confession and,
accordingly, Judge Clayton signed the instrument. There was testimony that although
appellant was alone in the room for some periods of time, detectives and other personnel
were in close proximity.

 Initially, appellant was charged as a juvenile with engaging in delinquent conduct. 
Subsequently, after the Potter County Court at Law waived its jurisdiction, the case was
transferred to the 320th District Court of Potter County, and appellant was indicted for
murder. It is that transfer that appellant challenges in her first issue. In doing so,
appellant claims the State neither pled nor presented proof that the Potter County Court
at Law "had been 'designated' a juvenile court." Specifically, she contends it is a fact issue
as to whether that court had been designated a juvenile court, and because of this, "the
designation by the juvenile board of Potter County must have been alleged and
affirmatively proven" in order for jurisdiction to attach. She bases that argument on the
premise that "a juvenile court is not one of general jurisdiction, [and] its power to act is
derived exclusively from the statutory authority taken from the Texas Family Code." In
support of her proposition that factual proof is required, she cites and relies on In the
Matter of A.S., 875 S.W.2d 402, 403 (Tex.App.--Corpus Christi 1994, no writ).

 Appellant's second issue centers around the fact that she was not taken to the
police department from the crime scene until 45 to 50 minutes after the police arrived. The
ultimate holding of the Court of Criminal Appeals is that the 45-minute delay in taking
appellant to the police station cannot be construed as unnecessary. (2) Specifically, the
Court of Criminal Appeals deemed the 45-minute delay as "de minimis" and "necessary." 
In reaching its decision, that court reasoned that law enforcement was engaged in "trying
to save the victim's life," investigating the stabbing, and securing the scene. The Court of
Criminal Appeals believed that six officers, paramedics, Amarillo Medical Services, and
the Fire Department were "necessary" in order to properly carry out the listed tasks. Thus,
under these circumstances, "unnecessary delay" is not present, and appellant's second
issue is overruled.

 Appellant's third issue contention is the trial court erred in refusing to submit the
defense of necessity pursuant to section 9.22 of the Penal Code. That section provides:

 § 9.22. Necessity

 Conduct is justified if:


 (1) the actor reasonably believes the conduct is immediately
necessary to avoid imminent harm;


 (2) the desirability and urgency of avoiding the harm clearly outweigh,
according to ordinary standards of reasonableness, the harm sought to be
prevented by the law proscribing the conduct; and


 (3) a legislative purpose to exclude the justification claimed for the
conduct does not otherwise plainly appear.


Tex. Penal Code Ann. § 9.22 (Vernon 1994).

 In contending she was entitled to submission of the defense, appellant relies on the
testimony of herself and Dr. Anthony Arden. Dr. Arden, a psychologist, was called by the
defense as an expert witness. In her testimony, appellant averred that she stabbed the
victim "[b]ecause I didn't want him to be with my little sister and I didn't want him to come
into my room anymore. I wanted him to stop." Dr. Arden testified that appellant believed
Winegar was forcing himself sexually upon her sister and she sought to provide an
immediate defense for herself and her sister. He also testified that in his professional
opinion, appellant reasonably believed her conduct was necessary to avoid imminent harm
to herself and her sister.

 In support of her proposition that she was entitled to the charge, appellant claims
that the central issue of material fact concerning her defense was whether she reasonably
believed that stabbing Winegar was immediately necessary to avoid imminent harm to her
and her sister. By being deprived of the charge, she reasons, her defense was
irretrievably harmed. In her argument, she points out that in situations where the defense
is raised, the reasonableness of an accused's belief is a question of fact to be determined
by the fact finder. Egger v. State, 817 S.W.2d 183, 185 (Tex.App.--El Paso 1991, pet.
ref'd), citing Fitzgerald v. State, 782 S.W.2d 876, 885 (Tex.Crim.App. 1990), and Sanders
v. State, 707 S.W.2d 78, 79-80 (Tex.Crim.App. 1986). Furthermore, she posits, the
reasonableness of an accused's belief must be viewed from the defendant's viewpoint at
the time she acted. Juarez v. State, 886 S.W.2d 511, 514 (Tex.App.--Houston [1st Dist.]
1984, pet. ref'd). In response, the State contends any belief by appellant that her action
was necessary was unreasonable as a matter of law.

 Under the statute, to be entitled to the defense, appellant would have to
demonstrate that she met all three of the statutory elements of the defense. Under this
record, appellant has failed to show her action was immediately necessary to avoid
imminent harm. According to her trial testimony, Winegar told appellant to go to bed at
about 12:00 a.m. About three or four minutes later, Kenna came to her room and told her
it was too late to be up and not to smart off to anyone in the house. At approximately 1:40
a.m., appellant got up and went to the kitchen, where she got a glass of water and a knife,
which she carried back to her bedroom. She put the knife on a chair and got back in bed. 
At that time, she testified that Winegar had not been in her room. 

 After her return, she said, Winegar came into her room and "pulled back the covers
and he reached out to touch me and I rolled over onto my back." She testified he stayed
"probably three minutes" and then went into her sister's room and, as she lay on the bed,
she thought about killing Winegar. About ten minutes before 3:00 a.m., she went into her
mother's bedroom and stabbed Winegar. Although she admitted she had stabbed
Winegar, she averred that the last thing she remembered was walking into the room, "him
rolling over," and then being on the telephone. She acknowledged she had written a letter
to a friend dated January 7, 1996, in which she said, "I made it home okay and I haven't
killed Neal yet." This record, particularly in view of the time lapses it shows, is not
sufficient to show that at the time appellant stabbed Winegar, killing him was immediately
necessary to avoid imminent harm to herself or another person. Because the first
condition of the necessity defense was not shown, the trial court did not err in refusing its
submission. Appellant's third issue is overruled.

 Because appellant discusses her fourth and fifth issue contentions together, we will
do likewise. In these issues, she posits that the trial court erred in refusing to submit jury
charges on self-defense and defense of third persons. Self-defense is codified in section
9.31(a) of the Penal Code, and provides:

 § 9.31. Self-Defense

 Except as provided in subsection (b) of this section, a person is justified in
using force against another when and to the degree he reasonably believes
the force is immediately necessary to protect himself against the other's use
or attempted use of unlawful force.


Tex. Penal Code Ann. § 9.31(a) (Vernon Supp. 2001).

 The second, defense of other persons, is found in section 9.32 of the Penal Code,
which provides:

 § 9.32. Deadly Force in Defense of Person

 A person is justified in using deadly force against another:


 (1) if he would be justified in using force against the other under Section
9.31;


 (2) if a reasonable person in the actor's situation would not have retreated;
and


 (3) when and to the degree he reasonably believes the deadly force is
immediately necessary;


 (A) to protect himself against the other's use or attempted use of
unlawful deadly force; or


 (B) to prevent the other's imminent commission of aggravated
kidnapping, murder, sexual assault, aggravated sexual assault, robbery or
aggravated robbery. 


Tex. Penal Code Ann. § 9.32 (Vernon Supp. 2001).

 Appellant claimed at trial that Winegar was sexually abusing her sister, and she was
afraid he would abuse her next. She testified that Winegar made her uncomfortable and
she did not like the way he looked at her. Even though her sister denied it, as we have
noted, appellant testified, and told Dr. Arden, that Winegar had gone into her sister's room
the night he was killed and appellant had heard the steel springs on her sister's bed
squeak. 

 For the reasons we have discussed in connection with appellant's third issue, there
was no evidence showing the immediacy of any threat posed by the victim. Even under
appellant's testimony, Winegar was asleep at the time he was stabbed and could not have
presented an immediate threat. That being true, appellant was not entitled to either a self-defense or defense of a third person charge. Her fourth and fifth issues are overruled.

 In her sixth issue, appellant contends the trial court erred at the punishment stage
of trial in refusing to submit the issue of whether the offense was committed under the
influence of sudden passion arising from adequate cause pursuant to section 19.02(d) of
the Penal Code. To be entitled to the submission of that issue, of course, there must be
evidence that she acted under the influence of sudden passion arising from adequate
cause. "Adequate cause" is a "cause that would commonly produce a degree of anger,
rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind
incapable of cool reflection." Tex. Penal Code Ann. § 19.02(a)(1) (Vernon 1994). "Sudden
passion" is defined as "passion directly caused by and arising out of provocation by the
individual killed or another acting with the person killed which passion arises at the time
of the offense and is not solely the result of former provocation." Tex. Penal Code Ann.
§ 19.02(a)(2) (Vernon 1994).

 In support of her contention under this issue, appellant points to her trial testimony
wherein she is asked why she stabbed the victim, and she responded:

 Because I didn't want him to be with my little sister and I didn't want him to
come into my room anymore. I wanted him to stop.


* * *



 I wanted him to stop molesting my little sister and I didn't want him to come
after me. I was afraid that he was going to try to be sexual with me and I
didn't want him to. When he came into my room, I knew he was going to try. 
I was afraid of him. I was afraid for my little sister. And no one helped me. 
No one cared what I had to say. No one would listen. My own mother didn't
even listen. I just wanted it to be over.


 She also refers to the testimony of Dr. Arden, who concluded that appellant was
suffering from post-traumatic stress disorder because "she was sexually abused and lived
in sexual terror over time with a sexual perpetrator." As additional support for her
proposition that she was entitled to the sudden passion submission, appellant points to Dr.
Arden's testimony that she told him that "an hour or so before the stabbing, that she was
asleep in her bedroom . . . laying facing the wall. She began to have a sense that there
was someone in the room. She rolled over, still keeping her eyes closed for fear of what
she might see, she felt the covers removed from her. She felt someone reach down and
touch her vaginally." After this, "she lay virtually paralyzed in her bed, listening with great
intensity to what might happen then, and she heard Mr. Winegar (the victim) enter
[Sueletta's] room, she heard the steel bed springs in [Sueletta's] room." Although
appellant did not testify about this at trial, the doctor concluded she was suffering from
post-traumatic stress disorder and memories about her own sexual abuse were
disassociated, i.e., they were removed from her conscious awareness.

 Even viewed favorably to appellant, that evidence does not show she acted under
the requisite immediate influence of sudden passion. Appellant admitted in her trial
testimony that she had taken a knife from the kitchen, then returned to her room and set
the knife in a chair. When asked by several people whether Winegar had ever sexually
abused her, she denied it. Dr. Arden's explanation for this was that she had lost her
memory of this event due to post-traumatic stress disorder and only remembered it during
a "flashback." This type of evidence is not sufficient to show that appellant stabbed the
victim directly as a result of, and arising out of, provocation at the time of the offense. See
Hobson v. State, 644 S.W.2d 473, 478 (Tex.Crim.App. 1983). Passion solely arising from
a former provocation will not qualify. Id. Appellant's sixth issue is overruled.

 In her seventh and final issue, appellant claims the trial court abused its discretion
in admitting prosecution exhibits 4 and 13 because they were "gruesome, full-color
autopsy photographs" which had no relevance to any issue in the case. Moreover, she
argues, the exhibits "would leave a person of normal sensibilities with the impression that
Appellant almost cut the deceased in half with a chain saw as opposed to stabbing him
one time in the heart." Predictably, in response, the State claims the photographs aided
the jury in understanding Dr. Frost's testimony.

 In explaining the four admitted photographs out of the 19 tendered, Dr. Frost
testified:

 Well, State's Exhibit 13 is a depiction of the large medical incision of the
chest, the thoracostomy incision.

 

 Exhibit[s] 23 and 24 both display the injury to the heart, the stab wound to
the chest also penetrated the right ventricle of the heart, one of the heart
chambers, and caused a defect there a little over an inch in length.

 

 And Exhibit 4 is just another view of the stab wound and the chest wall
incision from a greater distance. . . . 

 

 A trial court's decision to admit a particular piece of evidence, over objection, is
measured by an abuse of discretion standard. Montgomery v. State, 810 S.W.2d 372, 379
(Tex.Crim.App. 1990) (on reh'g). In turn, whether it abused its discretion depends on
whether the decision fell within the zone of reasonable disagreement. Id. at 391-92. 
Admissible evidence must possess some probative value and that probative value must
not be substantially outweighed by its inflammatory nature. Long v. State, 823 S.W.2d
259, 272 (Tex.Crim.App. 1991), cert. denied, 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d
910 (1992). Furthermore, indicia such as gruesomeness, number, detail, size, color, and
perspective are relevant in assessing whether an abuse of discretion is shown. Santellan
v. State, 939 S.W.2d 155, 171-72 (Tex.Crim.App. 1997); Narvaiz v. State, 840 S.W.2d 415,
429 (Tex.Crim.App. 1992), cert. denied, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791
(1993). 

 As we have noted, appellant only challenges two of the four photographs admitted. 
Exhibit 4 is a photo of Winegar that shows his body from the top of his head to his thigh
area. According to Dr. Frost, the exhibit shows the stab wound from a view farther back
than just the heart itself, as in State's Exhibit 23 and 24. While it does show a long cut
across his chest that was done for medical purposes, it is not especially gruesome and is
not redundant of any other photograph. Exhibit 13, the other challenged photo, is a close-up of the heart as seen through the cut across the victim's chest, and it also shows the
stab wound which appears right above the heart. The photograph has a ruler right next
to the stab wound which shows the length of the wound. While it is true that pictures
showing a homicide victim are to some extent gruesome, we cannot say the pictures were
"so horrifying or appalling that a juror of normal sensitivity would necessarily encounter
difficulty rationally deciding the critical issues of the case after viewing them." Narvaiz, 840
S.W.2d at 429. That being so, we cannot say the record shows the trial court abused its
discretion in admitting the photographs. Appellant's seventh issue is overruled.

 In final summary, all of appellant's issues are overruled, her motion for rehearing
is overruled, and the judgment of the trial court is affirmed. 


 John T. Boyd

 Chief Justice

Publish. 
1. Appellant testified that she had been ironing in her room and Winegar had come
in and told her to go to bed because she was making too much noise.
2. Determinations of what constitutes "unnecessary delay" fall within the realm of
section 52.02(a)(2) of the Texas Family Code and are determined on a case-by-case
basis. 



e="text-decoration: underline">Hernandez v. State, 726 S.W.2d 53, 55 (Tex.Crim.App. 1986).


 Judicial review
of an ineffective assistance of counsel claim must be highly deferential to trial counsel and
avoid using hindsight to evaluate counsel’s actions. Ingham v. State, 679 S.W.2d 503, 509
(Tex.Crim.App. 1984). There is a strong presumption that counsel’s conduct fell within the
wide range of reasonable professional assistance. Strickland, 466 U.S. at 690. The
burden is on appellant to prove by a preponderance of the evidence that counsel was
ineffective. See McFarland v. State, 928 S.W.2d 482, 500 (Tex.Crim.App. 1996) (en
banc). The defendant must first prove that counsel’s performance was deficient, i.e., that
counsel’s assistance fell below an objective standard of reasonableness. McFarland, 928
S.W.2d at 500. If appellant has demonstrated deficient assistance of counsel, it is then
necessary that appellant affirmatively prove prejudice as a result of the deficient
assistance. Id. In proving prejudice, appellant must prove a reasonable probability that,
but for counsel’s errors, the result of the proceeding would have been different. A
reasonable probability is a probability sufficient to undermine confidence in the outcome. 
Hernandez, 726 S.W.2d at 55. 
          Any allegation of ineffective assistance of counsel must be firmly founded in the
record and the record must affirmatively demonstrate the alleged ineffectiveness. 
McFarland, 928 S.W.2d at 500. Failure to make the required showing of either deficient
performance or sufficient prejudice defeats the ineffectiveness claim. Id. Absent both
showings, an appellate court cannot conclude the conviction resulted from a breakdown
in the adversarial process that renders the result unreliable. Ex parte Menchaca, 854
S.W.2d 128, 131 (Tex.Crim.App. 1993). Appellate courts look to the totality of the
representation and the particular circumstances of each case in evaluating the
effectiveness of counsel. Ex parte Felton, 815 S.W.2d 733, 735 (Tex.Crim.App. 1991). 
It is possible that a single egregious error of omission or commission by appellant’s
counsel constitutes ineffective assistance. E.g., Jackson v. State, 766 S.W.2d 504, 508
(Tex.Crim.App. 1985) (modified on other grounds on remand from United States Supreme
Court in 766 S.W.2d 518 (Tex.Crim.App. 1988)).
          Applying these precepts to the case before the Court, we immediately recognize that
we have held that the motion to suppress was, in addition to being waived, properly denied
by the trial court. The effect of this holding is that, even if counsel’s conduct in waiving the
objection to the introduction of State’s Ex. 1 and 1A was deficient, even had he properly
preserved the objection, the evidence was properly admitted by the trial court. Therefore,
failing to preserve the objection could not be deficient assistance. McFarland, 928 S.W.2d
at 500. Accordingly, appellant’s final issue is overruled.
Conclusion
          Having overruled appellant’s issues, the judgment of the trial court is affirmed.




 
Mackey K. Hancock

Justice



Do not publish.